20 P.(2d) 267

**ALBUQUERQUE ALUMNÆ ASS'N OF KAPPA KAPPA GAMMA FRATERNITY v. TIERNEY, County Treasurer, et al.**

No. 3835.

Supreme Court of New Mexico.

Feb. 15, 1933.

Rehearing Denied March 28, 1933.

W. A. Keleher, T. E. Jones, and R. P. Barnes, all of Albuquerque, for appellant.

A. L. Zinn and J. D. Mell, both of Santa Fé, and C. V. Clayton, of Tularosa, for appellees.

WATSON, Chief Justice.

Appellant sued to enjoin collection of taxes, claiming that the property assessed is exempt.

The material findings may be thus summarized: Appellant is incorporated under 1929 Comp. St. § 32-506, authorizing the organization of "a corporation for religious, benevolent, charitable, scientific or literary purposes, or for the establishment of colleges, academies, seminaries, churches or libraries." The property in question is held in legal ownership by appellant, but purely in trust for the use of the active membership of Kappa Kappa Gamma as a chapter house at the University of New Mexico. This sorority is a constituent of a national organization of the same name. It is composed of a carefully selected group of bona fide women students of the University of New Mexico. The property is used as a fraternal home where the active members of the society board, room, study, hold social functions, and practice the principles of the society while in attendance at the University. The active members encourage scholarship, participate as a group and as individuals in University activities, discuss University and student problems, and require of all members a regular, orderly, and moral life. The local chapter is under the active supervision of the national organization, which requires the maintenance of certain standards, and is also under the direct supervision and control of the University to the same extent that the latter controls other students and organizations. An existing University regulation requires that all nonresident women students live either in a University dormitory or in one of these chapter houses, and this rule is essential to a proper supervision of women students. The dormitory facilities are not sufficient to accommodate the women students, and would have to be increased except for this and similar sorority houses.

The trial court refused to find that the use to which appellant's property is devoted is educational, and refused the injunction prayed.

Much that was urged in Temple Lodge v. Tierney, 37 N. M. 178, 20 P.(2d) 280, just decided, is here renewed, so it may be well to distinguish the two cases.

In the first place, the decision in the Temple Lodge Case rests upon a conclusion of charitable use of the property there in question. In the present case, the use is not claimed to be "for charitable purposes."

In the second place, it is not impossible that the Temple Lodge Case might have been decided on the ground of an educational use of the property there involved. Even so, the same conclusion would not necessarily follow in this case. The trial judge found that Masonry embraces and inculcates a system of philosophy and actively explores important fields of human knowledge. We have no similar findings here. No attempt at a similar showing seems to have been made. We have

nothing on which to base a claim that this society has an educational program of its own.

In the third place, while, under the varying provisions of the states, views are divided as to whether exemption extends to the property of Masonic Lodges, appropriately used, there is strong support for the exemption under provisions similar to ours, and scarcely any authority to the contrary. On the other hand, as will be seen, appellant is able to marshal from the decisions but weak support for its contention here.

In this, as in the Temple Lodge Case, appellee contends for a strict construction of N. M. Const. art. 8, § 3. That question we fully considered in the case mentioned, and need not pursue further. As there suggested, canons of construction are not arbitrary formulæ. They have not been devised, though frequently used, as a convenient means of supporting a bad conclusion. They are merely aids to logical deduction as to intent—always the ultimate question.

■ Appellant claims that this Greek letter sorority is a literary and scientific institution or society, and that the property is devoted exclusively to literary and scientific objects, and is thus exempt under 1929 Comp. St. § 141-110. We think not. We consider that statutory provision repealed by the Constitution. True, all territorial laws not inconsistent with the Constitution were to remain in force. And there is no necessary conflict between the exemption of property used for educational or charitable purposes, and the

continued exemption of the property of literary and scientific societies. It is another principle, however, which induces our conclusion. It seems plain from the face of article 8 that the Constitution makers intended to cover the whole field of exemption.

Section 3 is affirmative and self-executing. It creates exemptions. There is a strong presumption against an intent to permit the Legislature to create others. Inclusio unius est exclusio alterius. But this is not all. Section 5 gives the Legislature permission to make certain other exemptions. Here again the maxim applies. So the whole subject is covered. There can be no other source of exemption than section 3, which the Legislature cannot touch, and section 5, wherein the legislative power is limited to specified objects.

This is not to say that the use of property for literary or scientific purposes will always be immaterial to a claim of exemption. As suggested in the Temple Lodge Case, such uses might be deemed educational within the meaning of the Constitution.

■ Appellant ably urges two theories in support of its claim that the use of its property is for educational purposes. The first rests upon the character of the fraternity itself; the second upon its relation to the State University, undoubtedly an educational institution.

As to the first: Doubtless there are great cultural advantages in the college sorority mode of life. It is urged that the present conception of education is very broad, as shown by the expanding programs of educational in-

stitutions, and that it includes what may be gained from refined surroundings and contacts, and direction and incentive to high standards and ideals. But we cannot upon that alone hold that the sorority is an educational institution, or that its occupancy of the premises as a home of refinement and culture and select social activity is an educational use. Its claim must stand or fall upon the part it plays in University education. That phase of the matter has been most often considered by the courts, and is perhaps most strongly pressed here.

Among the *objects* enumerated in appellant's articles of incorporation we find: "To encourage scholarship, literary and scientific training of the women students at said University of New Mexico."

In some situations this might be determinative of the corporation's character as literary or scientific or educational. Not in this situation. It has been frequently pointed out that, since use is the criterion, it is necessary to show that the practice conforms to the profession.

The intimate relation of the sorority to the University cannot be doubted. The former could not exist without the latter. The active members must be University students. Colleges and Universities could and occasionally do, function without these adjuncts. However, it is not too much to say, as matter of judicial knowledge, that their sudden disappearance or suppression would be revolutionary in the world of formal education. This mode of college life has its critics and its advocates. As to this, it is enough to say that it is generally sanctioned, perhaps generally encouraged, by those in authority. It must be admitted finally, however, that, of these two intimately related institutions, the sorority is dependent upon the University, not the University upon the sorority.

Appellant urges that students must eat and sleep, must have a place for study, should have facilities for social concourse and improvement, may well be organized in such groups and live under such conditions as promote regulation and supervision by the University authorities, and emulation in scholarship and student activities. Other matters are presented as showing the advantages of these organizations to their members, to the University administration, and, broadly, to education itself. It is urged that, where the educational institution itself affords to its students these facilities—dormitories, dining halls, study halls, recreation halls—the uses are educational; as much so as in the case of classrooms, lecture halls and laboratories. Authorities support the contention, and we do not question it. Yale University v. New Haven, 71 Conn. 316, 42 A. 87, 43 L. R. A. 490; Harvard College v. Assessors of Cambridge, 175 Mass. 145, 55 N. E. 844, 48 L. R. A. 547; City of Chicago v. University of Chicago, 228 Ill. 605, 81 N. E. 1138, 10 Ann. Cas. 669; People v. North Central College, 336 Ill. 263, 168 N. E. 269.

It does not necessarily follow that, where the educational institution itself has failed to furnish these facilities and adjuncts to education, or has inadequately furnished them,

the same exemption will attach to property devoted to the same purposes by the students themselves, or by some independent agency. The contention that it does follow is not without force, since use, not ownership, is the test. Yet there is this difference: The very fact that an educational institution has devoted property to a use reasonably related to its general purposes, stamps that use as educational in the opinion of those intrusted with the responsibility for adopting educational policy. Every use of property by the institution bears a relation to every other use. The whole of its activities is necessarily its educational plan. This is limited by its resources. Each activity is reflected in its budget and in the cost of its educational program. We might readily assume, and it might be presumptuous to deny, that property in use by an educational institution is used for an educational purpose.

Appellant relies strongly upon the finding that, except for these sorority houses, the state would be put to the expense of erecting and maintaining additional dormitories for women. Thus is disclosed a quid pro quo of practical and pecuniary benefit to the state, fully commensurate, as it urges and as we assume, with the tax exemption claimed. We do not question that a correct theory of exemption looks to a resulting public benefit. Berger v. University of New Mexico, 28 N. M. 666, 217 P. 245. Nor would we dispute with him who shall assert the public benefit from sororities and sorority houses. In a close case, resulting benefit might help to identify a use as educational. Alone, it cannot. It is not the criterion. We could scarcely distinguish between the sorority and the fraternity as to tax exemption, on the ground that the former provides a necessary, the latter merely a convenient, college dormitory.

For precedents wherein the property of Greek letter societies has been held tax exempt, appellant is forced to rely upon Beta Theta Pi v. Board, 108 Okl. 78, 234 P. 354, 355; Kappa Kappa Gamma, etc., v. Pearcy, 92 Kan. 1020, 142 P. 294, 295, 52 L. R. A. (N. S.) 995, and State v. Allen, 189 Ind. 369, 127 N. E. 145. These authorities are not highly persuasive.

In the Oklahoma case it stood as admitted that the evidence brought the fraternity's claim within the statute exempting the property of "fraternal orders or societies." The sole question was whether such statutory exemption exceeded the constitutional limitation. This was decided in the negative, in view of the fact that the Constitution preserved, until otherwise provided by law, the exemptions existing under territorial laws, the latter having exempted the property of "libraries, scientific, educational, benevolent and religious institutions, colleges or societies, devoted solely to the appropriate objects of these institutions, * * *" and in the view that the existing statute was no "more specific or definitive in its exempting features" than the territorial statute.

In the Indiana case it was held that a statute expressly exempting the property of Greek letter fraternities was valid under a constitutional provision authorizing legislative ex-

emption "for * * * educational, literary * * * purposes. * * * "

These are the strongest cases in appellant's favor, and there is this important distinction to be noted: The Oklahoma and Indiana courts had before them the question of the constitutionality of statutes. Such being the question, they must resolve every doubt in favor of the validity of legislative action. We are interpreting a self-executing constitutional provision, seeking the fair and reasonable intendment.

The Kansas case is of no weight as precedent or authority. There a statute of unchallenged validity granted exemption to property "used exclusively by any college or university society as a literary hall or as a dormitory. * * * "

On the other hand, exemption has usually and frequently been denied to these Greek letter societies. See notes "Taxes: exemption of college fraternity house," 52 L. R. A. (N. S.) 995; "Exemption of college fraternity house or dormitory from taxation," 35 A. L. R. 1045; and Cooley on Taxation (4th Ed.) § 750; Kappa Gamma Rho v. Marion County, 130 Or. 165, 279 P. 555. The courts have usually considered that the facts in the particular cases disclosed a "dominant use" as a private boarding house, or that "the primary purpose" was to furnish "a private boarding place and dormitory for the use of the fraternity members." While each case will, of course, rest on its own facts, we think that the use shown in the case at bar is of this character.

So holding, we are constrained to affirm the judgment and to remand the cause. It is so ordered.

SADLER and HUDSPETH, JJ., concur.

ZINN, J., did not participate.

BICKLEY, Justice (dissenting).

Concurrence in the decision in Temple Lodge v. Tierney, 37 N. M. 178, 20 P.(2d) 280, just decided, brings me inevitably to a dissent in this case. There is no occasion for a stricter rule of construction in the one case than the other. In the Temple Lodge Case, the trial court found the use to be for charitable purposes, but not primarily so. In the case at bar, the trial court finds that the property is used for educational purposes, but not primarily for such purpose. We have held in the Temple Lodge Case that the Constitution makers manifested no intention that the phrase "all property used for educational or charitable purposes" should be limited by the word "exclusively" contained in the territorial exemption statute, but that the omission of this qualifying word indicates an intention to liberalize.

It is said in the opinion by the majority: "It is urged that, where the educational institution itself affords to its students these facilities—dormitories, dining halls, study halls, recreation halls—the uses are educational; as much so as in the case of classrooms, lecture halls, and laboratories. Authorities support the contention and we do not question it."

I am not moved solely by the fact that many decisions, including our own, furnish a *reason* for exemptions, the quid pro quo theory, but, if it be conceded that such property under ownership and use by an educational institution is used for educational purposes, I am unable to discover that the *character of the use* is affected by ownership by appellant or an intent in the Constitution to exclude such property so used from the exemption provision merely because not owned by the University, since ownership is not therein made a criterion. And particularly is this so in view of the findings of the court to the effect that an existing University regulation requires that all nonresident women students live either in a University dormitory or in one of these chapter houses, and that this rule is essential to a proper supervision of women students, and that the dormitory facilities are not sufficient to accommodate the women students, and would have to be increased except for this and similar sorority houses.

I deem it proper in support of my view to comment on the remark in the last paragraph of the majority opinion, that exemption has been usually and frequently denied. The note in 52 L. R. A. (N. S.) 995, there cited, discloses a reason for this. The note writer, after reviewing the decision in Kappa Kappa Gamma House Ass'n v. Pearcy, says: "The other cases involve the construction of statutes providing for the exemption of buildings used *exclusively* for literary, scientific or educational purposes, none of them including dormitory purposes, and as the *dominant use* was found to be to furnish private boarding houses to the members of the fraternity, the statute was held not to apply." (Italics mine.)

For instance, in New York, the Tax Law (Consol. Laws, c. 60 [section 4, subd. 7]) provides that: "The real property of a corporation or association organized exclusively for the moral or mental improvement of men or women, or for * * * educational, scientific, literary, * * * library * * * purposes, * * * or for two or more such purposes, and used exclusively for carrying out thereupon one or more of such purposes, * * * shall be exempt from taxation."

Under that act, although the court remarked that the property was to some extent, at least, used "for carrying out thereupon" one or more of the purposes specified in the statute, it was not exempt, because this fact did not answer the requirement of the statute unless it also appears that the building, as a whole, was "used *exclusively* for carrying out thereupon one or more of such purposes," and calls attention to the definition the lexicographers give of the adverb "exclusively" to mean "with exclusion of all others; without admission of others to participation." The court adopted also the rule of strict construction.

The Illinois Supreme Court in Knox College v. Board of Review, 308 Ill. 160, 139 N. E. 56, 35 A. L. R. 1041, was dealing with a statute which exempts from taxation all property used *exclusively* for school purposes.

I can readily appreciate the necessity under such enactments, that the dominant use be de-

termined as an incident to discovery of exclusive use for educational purposes. In the Temple Lodge Case, we regarded the dropping of the word "exclusively" out of the picture by the Constitution makers as significant.

The majority regard the Kansas case cited by appellant as of no weight as precedent or authority. It must be admitted that our Constitution does not specifically mention dormitories, nevertheless, the court said: "It was the evident purpose of the Legislature to encourage the construction and use of dormitories so as to provide homes for the nonresident students at colleges and universities. No reason is seen why this beneficent purpose of the Legislature may not be effectually carried out."

As we have seen from the findings of the court, it is apparent that our University, apparently with the acquiescence of controlling authorities, has considered the construction and use of dormitories to provide homes for nonresident women students as a beneficent purpose. The fact that this educational institution has stamped dormitories as appropriate adjuncts to its general purposes is not, I believe, controlling upon the court, but is strongly persuasive that such a building so devoted is used for educational purposes, within the meaning of our exemption law.

For the reasons stated, I dissent.

### On Motion for Rehearing.

WATSON, Chief Justice.

Perhaps not unnaturally appellant is impressed, and here strongly urges, that, having contemporaneously sustained the claim of a Masonic lodge (Temple Lodge v. Tierney, 37 N. M. 178, 20 P.(2d) 280, we have been inconsistent, or have at least indulged finespun distinctions, in overruling its claim. We shall add a word upon this point.

Counsel assume that we reached our decision in the Temple Lodge Case by adopting the liberal rule of construction of our exemption provision. Not so. We were urged by the appellee in both cases to the rule of strict construction, both on reason and on local authority. We set forth at some length in the Temple Lodge Case our grounds for rejecting the contention. But we did not declare for liberal construction. We concluded that the problem would not yield to a mere canon of construction, and that we had to decide whether the particular exemption claimed was within the "reasonable and probable intent" of the constitutional provision.

As a pure matter of interpretation of language, it requires some liberality, we confess, to conclude that the use described in the Temple Lodge Case is properly characterized as "charitable." So, on that basis, we had a doubtful case. In such cases, for reasons explained in the decision, the matter will generally be concluded by the construction which other branches of the government have long and uniformly followed. That consideration alone was perhaps sufficient to gain the decision for Temple Lodge.

But, as bearing on the reasonable and probable intent, we had also the fact that, under a variety of exemption provisions, there was

164

a considerable body of judicial decision sustaining the exemption and placing it on the ground that a Masonic lodge is a charitable organization and that property employed in its appropriate pursuits is charitably used.

As we viewed the case at bar, these considerations were absent. It is now stated that counsel in oral argument, though not in the brief, urged "that the administrative officials of this state had heretofore considered college fraternities exempt from taxation." This we did not recall. Giving it full force, it can mean only that one or two county assessors, for an indefinite period less than the life of our Constitution, have deemed such property not subject to taxation, a consideration of little force in determining the meaning of the constitutional exemption.

Nor was there any established or recognized doctrine that use of property for the purpose of college fraternities is an educational use. The authority is to the contrary.

There is another distinction. The charity which served to gain the exemption for Temple Lodge is practiced by the lodge itself, and the property is to that extent used for that purpose. We apprehend that we could not have yielded to the claim if the showing had been merely that the lodge was an association of persons engaged individually in charitable pursuits. That, upon the record, we considered the showing of appellant. It is now urged as against this that one of the objects embraced in the certificate of incorporation is "to exemplify, teach and practice the fraternal principles of Kappa Kappa Gamma fraternity, among the members thereof," that the trial court found appellant to have been organized for the purposes expressed in its charter, and that the property was used for the purpose of practicing the principles of the order. We do not understand that we may take judicial notice of the "fraternal principles" of this organization. How can we hold them to be educational, with no further fact before us than that they are "fraternal"?

Appellant recurs to its earlier contention that, since use, not ownership, is the criterion, it cannot matter at all whether the dormitory be owned by the educational institution or by an independent corporation, group, or individual. The proposition, though plausible, is unsound. We cannot correctly determine "the reasonable and probable intent" by such a logical formula. It is true that ownership of the property is not here a requisite of the exemption right, and that other common limitations on the right do not here exist. It does not follow that, in determining whether a particular use is educational, it may not at times be useful and necessary to inquire as to ownership. This we suggested in the Temple Lodge Case, saying: "Such limitations no longer exist, *at least not as arbitrary and controlling limitations.*"

The final expression in the original opinion requires another word. It does not accurately represent our conclusion. It might be inferred that we deemed this a case of an educational use, overshadowed by other primary and dominant uses. In fact, it is our view that this record presents no use at all which

should be deemed educational within the meaning of the Constitution.

We feel constrained to deny the motion for rehearing. It is so ordered.

SADLER and HUDSPETH, JJ., concur.

ZINN, J., did not participate.

BICKLEY, J., dissents.