Merrimack
No. 7562

ST. PAUL'S SCHOOL

v.

CITY OF CONCORD

March 31, 1977

*Orr & Reno* and *William L. Chapman,* of Concord (*Mr. Robert H. Reno* orally) for the plaintiff.

*Paul F. Cavanaugh,* city solicitor, and *Upton, Sanders & Smith,* of Concord (*Mr. Richard F. Upton* orally) for the defendant.

LAMPRON, J. This is a petition for abatement of taxes assessed against St. Paul's School by the city of Concord for the tax year commencing April 1, 1975. The school's application to the Concord Board of Assessors for abatement was denied, and the school paid the taxes assessed. A petition for abatement was timely filed in the superior court and the case was referred for hearing by a Special Master (*Arthur H. Nighswander,* Esq.).

At issue are the qualifications for tax exemption under RSA 72:23 of certain of the school's buildings and land. In advance of the hearing the parties filed an agreed statement of facts. The master recommended that certain questions of law be determined prior to consideration of the entire case. The following questions were therefore transferred to this court by the Trial Court (*Keller,* C.J.) and our answers are appended thereto:

1. Is the School's interior campus exempt from taxation?
 Yes in part.

2. Are the separate faculty quarters in dormitory buildings, and the land appertaining thereto, exempt from taxation? Yes.

3. Are the School's other residential buildings occupied by faculty members, and the land appertaining thereto, exempt from taxation? Yes.

4. Are the School's parking lots exempt from taxation? Yes in part.

5. Are the School's garages exempt from taxation? Yes in part, remainder undetermined.

6. Is the School's land south of Interstate 89 exempt from taxation? No.

7. Is the Rectory, and land appertaining thereto, exempt from taxation? Yes in part.

8. Are the heating plant, transformer station, "gasometer" building (School post office) and Tuck Shop building, and the land appertaining thereto, exempt from taxation? The post office and Tuck are wholly exempt. The remainder, Yes in part.

9. If any part of one of the foregoing categories of property is not exempt from taxation, to what extent is it taxable? The details are set out in the opinion.

10. Both parties also made offers of proof. The school offered to prove the city's past practices in exempting certain school property. The city offered to prove that for private, secondary schools, "dormitory" has traditionally included the faculty quarters within the dormitory buildings. Each party objected to the other's offer of proof on the grounds of immateriality. The following question was therefore also transferred by the Trial Court (*Keller*, C.J.):

"Is the subject matter of any of the foregoing offers of proof material to the issues?" No.

St. Paul's School was incorporated in 1855 by special act of the legislature, Laws 1855, ch. 1757, for the purpose of establishing and maintaining in the city of Concord a school for the education of youth. The school has been operated continually since 1855 for that purpose. The school has no stockholders or members. It was not organized for and is not operated for profit. No trustee or other individual has any interest, direct or indirect, in the school's

income from any source. None of the school's income is used or appropriated for purposes other than educational.

There are approximately 495 boys and girls enrolled at the school as students in grades nine through twelve. There are 77 full-time teachers, several part-time teachers, and about 160 other personnel.

The school grounds, approximately 1,600 acres in size, are located about two miles from the business section of Concord. Of this land, approximately 160 acres constitute the "interior campus" where a majority of the school buildings are located. Some buildings are also located on another 80 acres adjacent to the "interior campus." The remaining 1,360 acres are wetland, forest land, and forage crop land. All the land and buildings are owned by the school.

By agreement dated October 21, 1970, and running continuously to the present, the school licensed the Audubon Society of New Hampshire to use a substantial portion of these 1,360 acres, located south of Interstate Route 89.

The school's claims that the buildings and lands in question are exempt from taxation are based on paragraphs IV and V of RSA 72:23, enacted in 1957 (Laws 1957, ch. 202). These two paragraphs provide, in pertinent part, that the following property is exempt from taxation:

IV. The buildings and structures of schools . . . owned, used and occupied by them for the purposes for which they are established, including but not limited to the dormitories, dining rooms, kitchens, auditoriums, classrooms, infirmaries, administrative and utility rooms and buildings connected therewith, athletic fields and facilities and gymnasiums, boat houses and wharves belonging to them and used in connection therewith, and the land thereto appertaining but not including lands and buildings not used and occupied directly for the purposes for which they are organized or incorporated . . . provided further that if the value of the dormitories, dining rooms and kitchens shall exceed one hundred and fifty thousand dollars, the value thereof in excess of said sum shall be taxable.

V. The real estate . . . owned by charitable organizations . . . and occupied and used by them for the purposes for which they are established . . . .

■ We address first the argument advanced by the school that it is a charitable corporation and is therefore entitled to the exemptions provided under RSA 72:23 V as well as the exemptions for which it qualifies as a school under RSA 72:23 IV.

We reject this argument. Following the school's reasoning, most schools could claim to be charitable corporations, operated for charitable purposes, and therefore entitled to both categories of exemptions. This is inconsistent with the obvious intent of the legislature. By treating "schools, seminaries of learning, colleges, academies and universities" under a separate paragraph from "charitable organizations and societies," the legislature manifested its view that these are distinct categories of taxpayers. If the legislature had considered schools to be charitable organizations for purposes of tax treatment, the separate paragraph covering schools would have been surplusage. Even though the school may be considered a charitable corporation for some purposes, such as a charitable trust, 4 A. Scott, The Law of Trusts § 370 (3d ed. 1967), it does not qualify for tax exemption treatment under RSA 72:23 V. See Rabun Gap-Nacoochee School v. Thomas, 228 Ga. 231, 242, 184 S.E.2d 824, 830–31 (1971).

The school's primary claim for tax exemption arises under the provisions of RSA 72:23 IV. The school argues that all of the property in question is "used and occupied directly" for its educational purposes, and should therefore be exempt from taxation under this paragraph. This case presents us with our first opportunity to interpret this section in relation to an educational institution. Prior to 1957, the tax-exempt status of school property was determined by the "seminaries of learning" or "exclusive use" exemption contained in R.S. 1842, 39:2, and by the "institutional exemption" contained in Laws 1913, 115:1. See Trustees &c. Academy v. Exeter, 90 N.H. 472, 501, 27 A.2d 569, 589 (1940).

"Exclusive use" in this context was not rigidly confined to mean only those "buildings, or parts of them, in which learning is taught and the process of actual education by instruction carried on." Id. at 504, 27 A.2d at 591. Rather, the statute was given a "reasonable construction" which took into account possible developments in seminary uses. Id. at 504–05, 27 A.2d at 591. Thus, athletic and recreational facilities, both land and buildings, as well as the infirmary, were considered exempt from taxation. Id. at 506, 27 A.2d at 592. Dormitories for students and residences rented by members

of the faculty were considered not to be within the "seminaries of learning" exemption. *Id.*

The "institutional exemption" provision was added in 1913, however, for the purpose of expanding the exemptions available under the "seminaries of learning" provision. The test of occupancy rather than exclusive use was intended to cover additional property. *St. Mary's School v. Concord,* 80 N.H. 436, 438, 118 A. 608, 609 (1922); *Trustees &c. Academy v. Exeter,* 90 N.H. 472, 503, 27 A.2d 569, 590 (1940). According to this standard, dormitories and faculty residences were entitled to tax exemption up to the value of one hundred and fifty thousand dollars. *Id.* at 506, 27 A.2d at 592.

The act of 1957 did not "simply restate" the former exceptions, *Appalachian Mountain Club v. Meredith,* 103 N.H. 5, 13, 163 A.2d 808, 814 (1960). The provisions of RSA 72:23 IV were intended to embody in one section both the "seminaries of learning" and the "institutional" exemptions. This paragraph lists several examples of tax-exempt property, all of which were previously covered by either the "seminaries of learning" exemption or the "institutional" exemption. *See Trustees &c. Academy v. Exeter,* 90 N.H. 472, 27 A.2d 569 (1940); *Trustees &c. Academy v. Exeter,* 92 N.H. 473, 33 A.2d 665 (1943).

The city argues that the phrase "used and occupied directly" in RSA 72:23 IV was intended to perpetuate the "exclusive use" test contained in the previous "seminaries of learning" statute. The school argues that the proper test of direct use is that of "reasonable necessity." In support of its position the city relies primarily on our decision in *Appalachian Mountain Club v. Meredith,* 103 N.H. 5, 163 A.2d 808 (1960), where we stated that the 1957 act did not repeal "the old doctrine of direct use." *Id.* at 15, 163 A.2d at 815. However, that statement was made in a context quite different from that presented here. We were there concerned with distinguishing property which was not used by an institution, but was merely owned and occupied by the institution for purposes of producing income which the institution could then use to further its purposes. *See Hedding &c. Association v. Epping,* 88 N.H. 321, 323–24, 189 A. 347, 349–50 (1937). We interpreted the provisions of RSA 72:23 IV and V to mean that such property, used only indirectly for charitable purposes, was not entitled to tax exemption. *Appalachian Mountain Club v. Meredith,* 103 N.H. 5, 13, 163 A.2d 808, 814. This being the apparent purpose behind the language in

paragraph IV requiring property to be directly used for educational purposes, we disagree with the city that paragraph IV incorporated the more narrow "exclusive use" test of the "seminaries of learning" statute. Rather, by combining the provisions of that statute with the provisions of the "institutional exemption" statute, it appears that the legislature intended a broader standard for exemption, such as had previously been achieved by applying both statutes.

We must therefore interpret the meaning of "used and occupied" on its own terms, and not according to a predecessor statute. As we noted in *Appalachian Mountain Club v. Meredith,* 103 N.H. 5, 163 A.2d 808 (1960), the language of paragraphs IV and V of RSA 72:23 regarding use and occupancy is similar, and should be interpreted alike. Although we have not before had occasion to address the use requirement in the context of paragraph IV, we have addressed the question with respect to paragraph V. In *Wentworth Home v. Portsmouth,* 108 N.H. 514, 238 A.2d 730 (1968), we held that a nurses and attendants' residence which was owned and used "for reasons of institutional necessity" was exempt from taxation under the use and occupancy standard of paragraph V, as was a parking lot which we considered "a necessary appendage of any building serving the public." *Id.* at 517, 238 A.2d at 732. In *Alton Bay Camp Meeting Asso. v. Alton,* 109 N.H. 44, 242 A.2d 80 (1968), we stated that the "integrated activities of the association as a whole" must be considered to determine tax exemption, and that facilities which are "reasonably necessary for the accomplishment of [the association's] charitable purposes" are exempt from taxation. *Id.* at 51, 242 A.2d at 86. The use and occupancy requirements of paragraph IV should be interpreted in light of the principles enunciated in these two opinions.

Although the language of the tax exemption statutes in other jurisdictions may differ, many incorporate the same use and occupancy test, and cases decided under such statutes may be useful in interpreting and applying the provisions of RSA 72:23 IV. Generally there is a strong presumption in favor of the judgment of an educational institution's officers as to what uses of land or buildings are necessary to promote the institution's purposes. *Phillips Academy v. Andover,* 175 Mass. 118, 124–25, 55 N.E. 841, 843 (1900); *Church Divinity School v. County of Alameda,* 152 Cal. App. 2d 496, 504, 314 P.2d 209, 214 (1957). Unless the determination of necessity has been made in bad faith or is unreasonable, courts are

reluctant to interfere by substituting their own determination of necessity for educational purposes. *Board of Assessors v. Pioneer Valley Academy, Inc.,* 355 Mass. 610, 616, 246 N.E.2d 792, 795 (1969); Annot., 55 A.L.R.3d 485, 530 (1974). While use and occupancy of a building might not be for classroom or for administrative purposes of the sort which would have been covered by the "seminaries of learning" exception, use and occupancy for other purposes may nevertheless be "as truly that for which the institution was incorporated," thereby entitling the institution to tax exemption. *Phillips Academy v. Andover,* 175 Mass. at 124, 55 N.E. at 843.

Against this background we turn to the specific items of property which are the subject of this appeal.

1. *Faculty quarters.* According to the agreed statement of facts, as a condition of employment, all full-time teaching members of the school's faculty are required to live in quarters either in the student dormitory buildings or in 29 free-standing houses. Of these, 21 are within the interior campus and the other 8 are immediately to the north and to the east thereof. Most dormitories have two or more faculty apartments. The 43 faculty members assigned to these quarters have the responsibility to act as advisors to groups of students, to supervise students in the dormitories, and must be available to the students at all times. Group activities within the dormitories often take place in the faculty quarters.

The duties of the 34 faculty members quartered in the free-standing houses are generally the same. They act as "godparents" to small groups of new students, act as "dormitory area supervisors," overseeing both students and faculty members in their area, and, on a rotating basis, they must chaperone school movies, dances, and other activities, and must preside at Sunday morning disciplinary proceedings.

These duties of the faculty members all involve more or less frequent contact with the students, often in the faculty living quarters. Faculty members are also expected to coach an athletic team or to act as advisor to some extracurricular student activity. Faculty members are also required to attend the sit-down dinners held four evenings each week. Married faculty members also put up guests of the school, such as parents, alumni, prospective students, and trustees. As a consequence of their duties, faculty members must limit somewhat their personal lives during the school year.

The requirement that teachers live on campus is intended by the school to further its philosophy of education. Students and faculty members are expected to develop close personal relationships which will assist the students' personal and social, as well as academic development. Faculty members make no payment for their living quarters or for meals. No adjustments to salary are made to reflect differences in either living quarters or responsibilities.

 Faculty quarters in student dormitories and on secondary school campuses is common. In *Trustees &c. Academy v. Exeter*, 90 N.H. 472, 27 A.2d 569 (1940), we determined faculty quarters to be "properly . . . devoted to educational purposes" so as to fall within the "institutional" exemption. However, from the many cases addressing this question ·faculty quarters such as these are generally considered to be property which is used and occupied directly to promote the school's educational purposes. *E.g., Rabun Gap-Nacoochee School v. Thomas*, 228 Ga. 231, 184 S.E.2d 824 (1971); *Board of Assessors v. Pioneer Valley Academy, Inc.*, 355 Mass. 610, 246 N.E.2d 792 (1969); *Phillips Academy v. Andover*, 175 Mass. 118, 55 N.E. 841 (1900); *Pingry Corp. v. Hillside Tp.*, 46 N.J. 457, 217 A.2d 868 (1966). From the agreed facts in this case it is apparent that the dominant purpose for which faculty members occupy these quarters is to participate effectively in the educational scheme of the school and not merely to have a place of residence. Occupancy of quarters in close proximity to the students is necessary to enable the faculty to perform the many duties required of them outside the classroom. Faculty quarters in free-standing houses and in dormitories and the land appertaining thereto are used and occupied directly for the purposes for which the school was organized and are exempt from taxation under the provisions of RSA 72:23 IV. *Board of Assessors v. Pioneer Valley Academy, Inc. supra; Phillips Academy v. Andover supra; Pratt Institute v. Boyland*, 16 Misc. 2d 58, 174 N.Y.S.2d 112 (1958), *aff'd*, 8 App. Div. 2d 625, 185 N.Y.S.2d 753 (1959); *see Concordia College Corp. v. State*, 265 Minn. 136, 145–48, 120 N.W.2d 601, 607–08 (1963). *See also Alton Bay Camp Meeting Ass'n v. Alton*, 109 N.H. 44, 242 A.2d 80 (1968).

The city argues that the value of the tax exempted faculty apartments located in dormitories should be included in the determination of the school's exemption limit of $150,000 for "dormitories, dining rooms, and kitchens." RSA 72:23 IV. To that end the city

offered to prove in the trial court that the dormitories of private secondary schools have traditionally included faculty quarters. The school offered to prove that since 1962 the city has not included the value of these faculty apartments in computing the total value of the school's dormitories. Each party objected to the proof offered by the other party as being immaterial.

We have held tax exempt the free-standing houses occupied by members of the faculty. This ruling was based on the fact that their occupancy was necessitated as being a direct and integral part of the education or learning imparted to the students, which is the primary object of the school. Faculty quarters located in dormitories have also been held tax exempt for the same reason.

■ "Dormitories, dining rooms and kitchens" which are tax exempted by RSA 72:23 IV pertain primarily to the lodging and sustenance of students. Prior to the present statute they were part of the so-called institutional exemption which always carried a limit to the amount of the exemption granted, with an option on the part of a municipality to increase the exemption. R.L. 73:24–26. We are of the opinion and hold that given the past history of tax exemptions in this field the legislature intended "dormitories" in RSA 72:23 IV to mean that part of the dormitory building occupied by students and not the faculty quarters which are "literally open to the students at any time of day or night" as part of the educational process. It follows that the offers of proof pertaining to the meaning of "dormitories" relative to the exemption from taxation granted to the faculty quarters therein are immaterial.

2. *The rectory.* The headmaster of the school is referred to as the rector. The rectory, a three story structure, is used for meetings of the board of trustees and its subcommittees, for faculty and school committee meetings, for weekly gatherings of the entire student body, and for entertainment and lodging of visiting scholars, lecturers, guests, alumni, parents and prospective students. The rector's living quarters, a four room apartment, are located in the rectory. There is also a three room apartment occupied by the couple responsible for maintaining the rectory and preparing meals.

■ As with members of the faculty, it is necessary for the rector to reside on the school's campus in order to perform his duties, which are the entire management of the school. He does

not occupy his apartment merely as a place of residence, but occupies it in order to effectively perform his duties as school rector. The rector uses one of the rooms of his quarters as a working office. Exemption of his apartment in the rectory is therefore proper. *See, e.g., Holland Hall School v. Glass*, 497 P.2d 763 (Okla. 1972). *See also Alton Bay Camp Meeting Ass'n v. Alton*, 109 N.H. 44, 242 A.2d 80 (1968) (association manager's residence exempt).

Those portions of the rectory used for meetings of the board of trustees, administrators, faculty, and students must also be considered as used and occupied directly for school purposes and are therefore exempt from taxation. *Trustees &c. Academy v. Exeter*, 90 N.H. 472, 506, 27 A.2d 569, 592 (1940). In *Alton Bay Camp Meeting Association v. Alton*, 109 N.H. 44, 242 A.2d 80 (1968), we considered the building where visiting ministers were housed to be exempt from taxation under RSA 72:23 V. Similarly, we consider those portions of the rectory occupied by visiting scholars and lecturers and other official guests, to be used and occupied directly for school purposes within the meaning of RSA 72:23 IV, and therefore tax exempt.

■ The agreed statement of facts provides no evidence of the manner in which housing guests, alumni, parents or prospective students might be considered as reasonably necessary for the school's purposes. The burden rests upon the taxpayer to show that these uses of the rectory come within the exemptions provided by RSA 72:23 IV. *MacMurray College v. Wright*, 38 Ill. 2d 272, 278, 230 N.E.2d 846, 850 (1967). We therefore conclude that those portions of the rectory used for these latter purposes are taxable. *Trustees &c. Academy v. Exeter*, 90 N.H. 472, 502, 27 A.2d 569, 590 (1940); *Y.M.C.A. v. Keene*, 70 N.H. 223, 46 A. 186 (1900). There is also no evidence as to the particular necessity for providing living quarters for the couple in charge of maintenance and meals. For the reasons hereinafter given in support of the taxability of staff quarters in general, their apartment is taxable. The land appurtenant to the rectory should be taxed in proportion to the portion of the rectory which is taxed.

3. *Staff quarters*. The school employs approximately one hundred forty persons to maintain the buildings, grounds and equipment, to staff the kitchen and dining rooms, and to perform custodial and general housekeeping services. For a nominal charge, some housing is available for staff in buildings on the school's

campus. Approximately one-half of the building and grounds personnel, one-half of the kitchen and dining room personnel, and some custodial personnel live in these quarters. No adjustment in wages is made for personnel living on campus.

The school is located two miles from the business district of Concord, and there is no public transportation to the school. Some of the kitchen and dining room personnel must be at work early in the morning or during the evening, and may have free time between meals during the day. None of the employees are required to live on the school grounds, but such a living arrangement is convenient for the school. While the presence of staff on the school grounds may contribute to the efficient operation of the school, the record does not establish that such an arrangement is "reasonably necessary" to promote the school's purposes.

■ Nothing in the record indicated that any of these employees used their living quarters in performing their duties. Although it was agreed that availability of the maintenance and service personnel on a twenty-four-hour-per-day basis is desirable, this situation is distinguishable from that of the nurses and attendants whose residence was held to be exempt in *Wentworth Home v. Portsmouth,* 108 N.H. 514, 238 A.2d 730 (1968). Although the school is some distance from private housing in the Concord area, there is nothing in the record to indicate that campus quarters are necessary to attract qualified staff. *See Church Divinity School v. County of Alameda,* 152 Cal. App. 2d 496, 506, 314 P.2d 209, 215–16 (1957). We therefore conclude that the staff quarters are occupied primarily for the convenience of the employees, and not for school purposes, and that the quarters and the land appertaining thereto do not qualify for tax exemption under RSA 72:23 IV. *Rabun Gap-Nacoochee School v. Thomas,* 228 Ga. 231, 246, 184 S.E.2d 824, 833 (1971); *MacMurray College v. Wright,* 38 Ill. 2d 272, 230 N.E.2d 846 (1967).

■ 4. *Tuck Shop.* The Tuck Shop building, located on the interior campus, contains a snack bar and social room for students, and a store where students may purchase school books, athletic equipment, and toilet articles. With respect to these facilities we also consider the age of the student body, grades nine through twelve, the fact that they all live in dormitories on campus, the distance of the school from the business district of Concord, and the lack of public transportation. We agree with the school that

these uses of the Tuck Shop are all reasonably necessary as part of the comprehensive academic, recreational and living situation established by the school and is used directly for school purposes. The fact that students may pay for food in the snack bar and for articles from the store does not alone make these facilities taxable. *See Church Divinity School v. County of Alameda,* 152 Cal. App. 2d 496, 504, 314 P.2d 209, 214 (1957). We hold, therefore, that the Tuck Shop and the land appertaining thereto is exempt from taxation under RSA 72:23 IV. *See Alton Bay Camp Meeting Asso. v. Alton,* 109 N.H. 44, 51–52, 242 A.2d 80, 85–86 (1968).

5. *School post office.* All incoming mail for students, faculty, and administrators is received and sorted at the school post office. Mail for students and faculty is distributed to post office boxes located there. The receipt of mail by the school administration is obviously necessary for its proper operation of the school. The receipt of mail by students and faculty at the school post office must be considered an integral part of their living arrangement, and therefore necessary in view of the requirement that all students and faculty live on school grounds. That portion of this building used as the school post office, and the land appertaining thereto, is therefore exempt from taxation as it is used directly for school purposes. This building also contains a welding shop, used by the home arts department for instructional purposes. The remaining portion of the building is used for storage of school property. The city agrees that these parts of the building, and the land appertaining thereto, are exempt from taxation. Hence the entire building and appertaining land is wholly exempt from taxation.

6. *Heating plant and transformer station.* The school's central heating plant, located within the interior campus, generates heat for buildings on the interior campus. The transformer station reduces the voltage of incoming electric current prior to distribution to school buildings.

The city agrees with the school that the use of these buildings to provide heat and electricity to school buildings is reasonably necessary, if not essential, to the operation of the school. However, the city argues that the tax exempt status of these facilities should be apportioned according to the tax exempt status of the buildings which are provided with the heat and electricity. We agree. This is in accord with our holding in *Trustees &c. Academy v. Exeter,* 90 N.H. 472, 27 A.2d 569 (1940), that partial taxation was re-

quired of a central heating plant serving both exempt and non-exempt buildings. *Id.* at 506, 27 A.2d at 592.

7. *Garages.* There are a number of garages on the school grounds. Some house school vehicles used for school purposes. Others house vehicles privately owned by faculty members and other school employees. The city agrees that those garages which house school vehicles should be tax exempt, but argues that those garages used for faculty and employee vehicles should be treated in the same manner as faculty and employee living quarters. We hold that garages used to house cars belonging to members of the faculty, whether living in free-standing houses or in dormitory quarters, are also tax exempt. We are unable from the scant details in the agreed statement of facts as to the type, location and nature of the use of other garages which may remain to reach a conclusion as to their tax status. *Church Divinity School v. County of Alameda,* 152 Cal. App. 2d 496, 503–504, 314 P.2d 209, 214 (1957); *see Wentworth Home v. Portsmouth,* 108 N.H. 514, 517, 238 A.2d 730, 732 (1968).

8. *Parking lots.* There are approximately sixteen parking lots on the school's interior campus. The capacity of these lots range from two or three to twenty-six vehicles. They are used by parents of students, guests of and visitors to the school, alumni, faculty and employees. The tax status of these parking lots should be determined according to the status of the buildings which they serve. Where a building is partially taxed, or where one or more buildings served are taxed, a proportionate value of the parking lot should also be taxed.

9. *Interior campus.* The school's interior campus is approximately one hundred sixty acres in size. In this area are located the classroom buildings, library, administrative and business office buildings, chapel, gymnasium, hockey rink and other athletic facilities, dormitory buildings, dining halls, kitchens, heating plant, and living quarters for faculty and staff. Almost all school activities, both formal and informal, take place on the interior campus.

The school argues that, under the test of "integrated activities . . . as a whole," articulated in *Alton Bay Camp Meeting Association v. Alton,* 109 N.H. 44, 51, 242 A.2d 80, 86 (1968), and in light of the community character of the school, all of the interior campus should be considered used for school purposes and therefore tax

exempt. However, RSA 72:23 IV only exempts lands which are "appertaining" to "buildings and structures . . . owned, used and occupied" for education purposes which also includes athletic fields. We interpreted this same language in RSA 72:23 III to require that such lands must be "a part of, or used directly in conjunction with" such buildings in order to qualify for exemption. *Alton Bay Camp Meeting Ass'n v. Alton supra* at 48, 242 A.2d at 84. We hold that the tax exempt status of the interior campus land must be determined in accordance with the same standard. Some of the buildings on the interior campus, such as staff quarters, are taxable. Those portions of the interior campus used in conjunction with these buildings should also be taxed. We therefore hold that the taxability of the interior campus should be determined by apportionment of the value of the interior campus between those buildings and structures which are taxable, and those buildings and structures which are exempt. *See Trustees &c. Academy v. Exeter,* 90 N.H. 472, 506, 27 A.2d 569, 592 (1940); *Trustees &c. Academy v. Exeter,* 92 N.H. 473, 476–77, 33 A.2d 665, 668 (1943).

 10. *Land south of Interstate Route 89.* A tract of the school's land, located just south of Interstate Route 89, is licensed to the Audubon Society of New Hampshire, a charitable corporation. The purpose of this licensing agreement is to permit the Audubon Society to use the land in question as a natural science teaching resource in connection with Project SEE (School Environmental Education). This program is primarily for students in Concord and other public schools. The Audubon Society conducts field trips on this land in which members of the general public as well as the society participate. The Society also uses this land in teaching wildlife and forestry management techniques to students, most of whom are from St. Paul's School. The Audubon Society pays no rent or compensation of any kind to the school for the use of this tract of land. The school receives no income of any kind from this land. It is agreed by the parties that this land is used and occupied by the Audubon Society for the purposes for which it was organized.

The tax exemption granted by RSA 72:23 IV applies to "[t]he buildings and structures of schools . . . owned, used and occupied directly by them for the purposes for which they are established . . . ." It is clear from this language that not only must the school be the entity which owns the property, but it must also be the entity which uses and occupies the property. As it is the Audubon Society and not the school which uses and occupies the land south of In-

terstate Route 89, the school is not entitled to a tax exemption on this tract of land under RSA 72:23 IV which excludes lands and buildings not used and occupied directly by the school for its purposes. It is irrelevant that the Audubon Society might be entitled to an exemption under RSA 72:23 V, were it the owner of this land. *See Evangelical Baptist &c. Society v. Boston,* 204 Mass. 28, 90 N.E. 572 (1910).

11. *Offers of proof.* It is unnecessary to go into further details about the offers of proof of the parties pertaining to the makeup of "dormitories; what is to be included thereunder in computing the $150,000 limit of exemption for "dormitories, dining rooms and kitchens" under RSA 72:23 IV; and the past practices of the taxing authorities in regard to the taxability of certain parts of the school. We hold that even if the evidence were admitted it would not change the results reached in this opinion.

*Remanded.*

BOIS and DOUGLAS, JJ., did not sit; the others concurred.